UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DANIEL L. TILBURY,

            Petitioner,

    v.

ROBERT W. FOX, Warden,

            Respondent.

Case No. 15-cv-01266-HSG (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

      Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Daniel L. Tilbury, challenging the validity of a judgment obtained against him in state court. Respondent filed an answer to the petition. Petitioner has filed a traverse. For the reasons set forth below, the petition is denied.[1]

## I. PROCEDURAL HISTORY

      On December 8, 2010, a Santa Clara County jury found petitioner guilty of first degree murder (Cal. Penal Code § 187) and found true that he personally and intentionally discharged a firearm causing death (Cal. Penal Code § 12022.53(d)). Ex. 1 at 535, 541-42.[2] On January 21, 2011, the trial court sentenced petitioner to 50 years to life in state prison. Ex. 1 at 594, 596.

      Petitioner filed both a direct appeal and a habeas petition in the California Court of Appeal. Exs. 6 & 11. On September 10, 2013, the California Court of Appeal affirmed the judgment in an unpublished opinion and summarily denied petitioner's habeas corpus petition. Exs. 12 & 13.

---

[1] Petitioner previously named S. Frauenheim, warden of Pleasant Valley State Prison, as the respondent in this action. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Robert W. Fox, the current warden of California Medical Facility, where petitioner is currently incarcerated, is hereby SUBSTITUTED as respondent in place of petitioner's prior custodian.

[2] All references herein to exhibits are to the exhibits submitted by respondent in support of the answer, unless otherwise indicated.

On December 18, 2013, the California Supreme Court denied review of the direct appeal and of the denial of his petition for writ of habeas corpus.  Exs. 16 & 17.

On March 18, 2015, petitioner filed the instant petition for a writ of habeas corpus.

## II. STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are from the September 10, 2013 opinion of the California Court of Appeal[3]:

### I. The Prosecution's Case

Defendant and Kristine Ramos (Kristine) were the parents of three boys born in 2001, 2002, and 2004.  They separated in 2005, and their divorce was final in July 2008.  They shared custody of the boys equally pursuant to a March 2007 stipulated custody order.  In 2008, defendant was offered a promotion that would require him to move to Washington state.  Defendant accepted the promotion and moved into a three-bedroom apartment in Washington in early August 2008.  He told his coworkers, who helped him move in, that his children would be living there with him.  They moved bunk beds, toys, and children's books into the apartment for the children.  Kristine and the boys remained in San Jose.  They shared a home with Kristine's brother Michael Ramos, her fiancé Fabian Gonzales, her teenaged son Gilbert, Gonzales's son, and her two very young children with Gonzales.

Defendant was familiar with firearms, and he had a gun safe in a closet of the apartment.  He owned a .50 caliber Desert Eagle semi-automatic pistol with a seven-cartridge magazine that he had purchased in 1998.  This pistol was defendant's biggest gun, and the ammunition used by it is "one of the largest" and most "powerful" available.  Larger bullets "can produce more damage."

After he moved to Washington in August 2008, defendant drove down to California to visit the boys every month.  In December 2008, defendant told a coworker that his children would [be] joining him "around Christmas."  On December 16, 2008, Kristine filed in court a request for full custody of the boys.  On December 23, 2008, defendant arrived in San Jose.  He had driven down from Washington.  With him, he had brought his .50 caliber Desert Eagle pistol.  He had the pistol's magazine in his glove compartment.  When he picked up the boys from Kristine's home that day, her brother Michael served him with the papers Kristine had filed seeking full custody of the boys.  Defendant looked at the papers and became upset.  He and Kristine went outside to talk about the papers.  After they talked for 15 to 20 minutes, Kristine returned, and the boys left with defendant.

Defendant told his parents, with whom he and the boys were staying, that Kristine was seeking full custody of the boys.  Defendant also told them that "he would have to come

---

[3] This summary is presumed correct.  *Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254 (e) (1).

2

back down in January" and would not be able to take the boys to Washington due to Kristine's request for full custody. Defendant appeared to be "[a]nnoyed, tense." However, over the next few days, defendant appeared to be in a good mood as he and his family enjoyed the holidays with the boys.

On December 27, 2008, defendant called his coworker in Washington and told him that he needed to extend his vacation to consult with a lawyer. The next day, defendant told his coworker that "there was some problems with bringing his sons back up," and he needed more time to confer with a lawyer. Defendant said that "his wife had changed her mind on the custody and that she no longer wanted the kids to come up to Washington."

On December 29, 2008, defendant spent the day with the boys, making their meals, playing with them, and taking them to the doctor. But "as the evening progressed, he became annoyed, agitated, and frustrated." His change of mood seemed to be associated with his phone conversations with Kristine. Telephone records reflected that there were four telephone calls between them. Two calls were initiated by defendant just after 7:30 p.m., with one lasting just two seconds and the other, two minutes later, lasting just over two minutes. A third call, which was initiated by Kristine, was 81 seconds long and appeared to have occurred between the other two calls. These three calls occurred during dinner or just before they sat down to dinner. His parents overheard portions of his side of these phone conversations. Defendant said something about Kristine asking him for a favor, and there was also mention of a threat by Kristine to send the police over if he did not return the boys "right away." Defendant seemed "frustrated and angry." He said "[t]hat he had 50 percent custody of the boys and that he was in town visiting them and that—then he said 'If you need to send the police, send the police, but I have,' you know, 'custody of the boys, 50 percent custody of the boys.'" His father heard him say: "'Kristine, you want me to bring the kids back home now?'" and "'Go ahead and send the police over. I have a 50 percent custody agreement.'" His mother heard him say "'You want me to bring the kids back?'" He then said that "we're having dinner and, after we finish dinner, that he would see about bringing the kids back, that he would bring the kids back."

After dinner, defendant told the boys that "he'd be right back to play with them." Defendant had his phone in his hand, and he said he was going to "take a call outside." He appeared to be "annoyed and agitated" and "definitely frustrated with the phone calls." When he walked out, he was wearing jeans and a T-shirt. Defendant initiated another phone call to Kristine, which began at 8:16 p.m. and lasted about eight minutes. Defendant's father returned from a trip to the store and saw defendant standing in the driveway talking on his cell phone. Defendant "seemed to be pretty upset" and was yelling. Defendant's father went into the house.

After this last telephone conversation, Kristine was upset. Her brother Michael got the impression that defendant was going to be bringing the boys back that evening. Half an hour after that phone call, Michael heard a noise at the door, and he went and opened the door. Defendant was at the door. The drive from defendant's parents' house to Kristine's home takes about 30 minutes. Michael was expecting to see the boys, but he did not see them. Defendant said "Hi, Mike" and walked into the house. Michael replied "Hi." Defendant was wearing a long black jacket "that he normally had" that went down to his knees. Michael saw nothing in defendant's hands.

Defendant passed by Michael, approached Kristine, and said "'What's up, Kristy?'"  He pulled out his .50 caliber Desert Eagle pistol, pointed it at Kristine, and fired it repeatedly. Kristine fell to the ground, and defendant continued firing the gun at her on the ground. Defendant fired his gun a total of seven times, emptying the magazine.  After the last shot, defendant turned around, walked out the door, and drove away in his car at a normal speed. Kristine suffered gunshot wounds to her neck, chest, shoulder, back, arm and hand, resulting in her death.

At 8:45 p.m., defendant's father received a call from defendant.  Defendant told his father: "'She's not going to bother us anymore.'"  Defendant's father asked him what he meant, and defendant said: "'I shot her.'"  Defendant asked his father "to please take care of the boys" and said "'I did this to protect them from her.'"  Defendant's father told him to go to the police station and turn himself in.  Defendant's vehicle was stopped by the police at 9:10 p.m. in San Jose, and he was arrested.  No weapon was found in his possession.  He told the police that he had no guns with him and that all of his guns were in his gun safe in Washington.  Defendant also told the police that he used to own a Desert Eagle, but he had sold it because it was "worthless" and did not shoot well.

## II. The Defense Case

Defendant testified on his own behalf at trial.  He described the history of his relationship with Kristine.  They had three children together before she began an affair with Fabian Gonzales.  At the time, defendant suspected that Kristine was "cheating on me" and "using drugs."  Right after she and defendant bought a home together, she left defendant for Gonzales and moved into that home with Gonzales.  This occurred in July 2005.  When she left defendant, she took the boys, and defendant had no idea where they were for several days.  Initially, defendant and Kristine shared custody of the boys pursuant to an informal oral agreement.

Their post-separation relationship was troubled.  Defendant accused Kristine of taking money from his bank account.  In August 2005, Kristine filed for divorce, but she withdrew her petition in October and suggested to defendant that they might reconcile. Yet she continued to live with Gonzales.  When it appeared that the house would be foreclosed upon, Kristine convinced defendant to send money and letters to the lender by again suggesting that they might reconcile.  These efforts were unsuccessful, and the house was foreclosed upon in late 2006.  In 2006 and 2007, Kristine had two children by Gonzales.  Defendant learned of the new children because Kristine was still on his insurance and he received statements for her prenatal care.

Their shared custody arrangement did not work well.  Defendant repeatedly experienced conflicts with Kristine when he went to pick up the boys.  She sometimes refused to let him see the children, and he several times called the police.  He was concerned that Kristine was using methamphetamine while she had the boys in her custody and that she was sharing her home with other drug users.  By April 2006, defendant was caring for the children "most of the time."  He believed that Kristine's home was "dirty" and hazardous to the children.  The child custody conflicts and difficulties continued into 2007.  Because Kristine often would not show up when she had said she would, defendant frequently had to miss work.  He was worried that he would lose his job and be unable to support the

4

boys.  And the boys, who would be expecting Kristine, would be upset when she did not arrive on time or at all.

At the beginning of 2007, defendant talked to Kristine about formalizing their custody agreement.  He had gone to an attorney and had an agreement drafted.  Her response to his bringing up this subject was to keep the boys and not return them as scheduled.  She also did not take the eldest boy, the only one in school at that time, to school for a couple of days.  Defendant had no idea where she was living at the time, so he did not know where the boys were.  A week later, she brought the boys back.  Defendant had to have his attorney file a motion with the court to obtain the return of the children.  Defendant and Kristine subsequently went to family court and to mediation, and they ultimately committed to a formal "50/50" custody agreement.  Defendant's experience in family court gave him "the impression ... that the men were not really being given a fair shake in the family court system."

For a short while after they entered into the formal custody agreement, their relationship was smoother.  But it soon deteriorated again.  Their two-year-old son suffered a broken leg while in Kristine's custody, and defendant felt that she had not provided a satisfactory explanation for how that had occurred.  By late 2007, the boys were actually spending about 75 percent of their time in defendant's custody.  Defendant was devoted to the boys.

At the beginning of 2008, Kristine began spending more time with the boys. Defendant continued to be concerned about the children's safety at her home because "the place was kind of chronically dirty, chronically a mess," and "she had a bunch of people living there all the time." When defendant picked up the kids, they would be "dirty." The youngest boy would often have rashes "all over his body." The children were not being physically well cared for.  Defendant remained concerned about drug use in Kristine's home, particularly because he believed that Gonzales was supplying drugs to Kristine.  Defendant also was concerned that Kristine's home was "very crowded" with too many people living there.  Kristine told him that Gonzales had been in a fight on their front lawn with a tenant, and defendant thought there were "code violations" at the house.  At the same time, there were fewer problems between defendant and Kristine in terms of the custody exchanges.

The possible prospect of moving to Washington state first came up in the summer of 2007.  Defendant mentioned it to Kristine and told her "'I wouldn't take the offer if I wasn't able to move up there with the children.  I don't want to be away from the children.  I don't want to take them away from you.  So if you feel that you don't want me to move them out of state, then we won't do this.'"  By early 2008, the prospect had developed into an actual offer by defendant's employer of a job in Washington.  Defendant told Kristine of the offer and said: "'And so I need to know, are you serious?  Can I take the kids up there if I accept this?'"  After thinking about it for a couple of days and asking him some questions, Kristine agreed to the plan.

Defendants' parents testified that, in April 2008, Kristine told them that she would allow defendant to take the boys to Washington if he accepted the promotion.  Defendant accepted the offer, and he began preparing for the move.  He repeatedly asked Kristine if she was "'sure,'" and she assured him that she was.  Defendant believed that Washington would be a better place to raise the boys: cleaner, safer, less crowded, and with better schools.  Defendant originally planned to move the boys to Washington at the end of

August 2008.  He had already registered them at a school in Washington that was close to the apartment he had rented.  He had not completely resolved child care issues, but his mother had offered to come up to Washington for a couple of months to watch the kids while he was at work until he secured childcare.

Before he left for Washington in August 2008, Kristine told him that she was not ready for him to take the kids away from her.  She said that he could take the kids to Washington in December after she had had a chance to spend more time with them in the interim.  Defendant was "upset," but he felt that waiting until December was "better than nothing."  He moved to Washington without the boys.  In September, defendant drove down to San Jose to spend a week with the boys for their birthdays.  He did not bring a gun with him on this journey.  On his drive back to Washington, he stopped and slept at a rest stop.  A "scary dude" knocked on his window in the middle of the night and startled him.  The guy was "looking for change," and defendant gave him some.  That experience changed his "threat assessment" for his trips between Washington and California.  In October, defendant again drove down to visit the kids, and again in November he drove down to see the boys for Thanksgiving.  He brought his .50 caliber Desert Eagle pistol with him on the drive.  "[I]t seemed prudent to me to make sure that I was ready for contingencies, ready in case someone decided to...."  He selected this pistol because it was his "biggest gun."

Each time defendant had to drive back to Washington and leave the boys was "heart-wrenching."  It was "depressing" for him to be away from the kids.  When he spoke to the boys on the phone, they asked when they were going to be coming to Washington, and he told them "'I think it's going to be December,' 'I hope we are going in December.'"  Defendant felt "sad," and he compensated by working a lot and "drinking a lot."  He recognized that he was an alcoholic.  He was "[i]ncredibly depressed."  Ten or 15 times, he "actually had the gun in my mouth, and I was ready to—to, you know, blow it.  And I thought of my kids .... [¶] ... and, um, I would—I would stop and I would start drinking...."  He talked to Kristine on the phone frequently.  She never said anything about having changed her mind about letting him move the boys to Washington in December.  In fact, in October, she asked him to take her 14–year–old son to Washington along with their three boys, and defendant immediately agreed to do so.

Defendant drove down to California again on December 22, 2008, arriving in California on December 23.  He again brought his .50 caliber Desert Eagle pistol with him from Washington to California, storing it under the passenger seat.  He drove through the night, but stopped at a rest stop to sleep on the way.  Once he reached his parents' house, he removed the pistol from the car and put it in his parents' house, but he left the magazine in the glove compartment.  When he went to Kristine's house to pick up the boys, Kristine came outside to talk to him.  She said that "she had filed something," but she "didn't mean to do it" and would "withdraw the paperwork on Monday as soon as the courts opened."  Michael then served defendant with the papers in which she sought 100 percent custody of the boys.  He was "shocked."  Defendant thought Kristine "wasn't really serious about withdrawing" the papers.  He thought "it was obvious she was using the move against me.  That she had denied me for taking the kids up there in August in order to be able to establish what she called the status quo as having the children with her."

He picked up the boys and took them back to his parents' house.  As they had been on previous occasions when defendant picked them up from Kristine, the boys were dirty,

6

hungry, and did not have adequate clothing.  The youngest boy, who was potty trained, was in a diaper that had not been recently changed, and he and one of his brothers both had a rash.  Defendant expressed concern to his parents that the boys had "regressed academically" in his absence and had not been well cared for.  The boys were seven, six, and four years old at this point.  Because it was the holidays, defendant was "trying not to worry about things."  Yet he felt that he "had these things hanging over my head" because of Kristine's request for full custody.  He would need to return to San Jose in January to deal with that, but he was not sure he had any more time off available.  He worried that he was bound to the lease for his Washington apartment and that he might lose his job due to the custody dispute.  On December 27 or 28, 2008, defendant talked to Kristine on the phone about her request for full custody.  He wanted to know if she was going to withdraw it.  She told him that she was not going to withdraw her request.

Defendant testified that, on December 29, 2008, when he returned to the house with the boys that evening, before he started making dinner, he transferred his pistol from the house to the car so that it would not be in the house while the boys were there.  During his first telephone conversation with Kristine that evening, she asked about using his insurance to cover her teenaged son's dental expenses.  Defendant "expressed some dismay that she was asking me for this favor after, you know, everything that she was doing."  He recalled that they had several additional phone conversations that evening.  She wanted to know when he was leaving for Washington.  He said he did not know.  She "became very agitated and excited," "yelled" at him, and insisted that he provide a specific date.  When he repeated that he did not know when he was leaving, she "threatened to call the police and have the police come and remove the kids from my custody."  Defendant found these conversations "frustrating, infuriating."  He told her that if she sent the police over it would just "make a scene" because he had "the necessary paperwork" and "things would work out."  Defendant testified that Kristine called him again and told him that she had "called the police, and the police were right around the corner."  He was not sure if she was "bluffing" as she had done before.

After that, defendant recalled that he lost touch with reality.  He "didn't have control of myself.  I didn't have control of the situation at that point.  And so I was scared."  He had no recollection of any further conversations with Kristine or any phone conversation while standing in the driveway.  Defendant remembered thinking that he needed to go get some alcohol or some marijuana to "calm me down," but he did not remember leaving the house.  The next thing he remembered was driving on the freeway.  After that, he remembered a dog barking and an officer pointing a shotgun at him.  Defendant testified that he had no recollection of going to Kristine's house on December 29.  He also testified that he did not remember what happened to the pistol or calling his father afterwards.

Defendant's mother testified at trial that she recalled four phone calls, two of which occurred during dinner.  She heard defendant saying into the phone before dinner "'You served me with papers, and now you're asking me for a favor.'"  She testified that at least two calls were initiated by Kristine, and defendant immediately hung up on her one time.  She also testified that Kristine called a second time during dinner when she recalled defendant's cell phone rang.

The telephone records conflicted with defendant's and his mother's testimony about the number and originator of the telephone calls.  At 7:34 p.m. on December 29, 2008, a call

was made from defendant's parents' landline phone to Kristine's home phone.  This call lasted for three seconds.  Also at 7:34 p.m., a call was made from Kristine's home phone to defendant's cell phone.  This call lasted for 81 seconds (one minute and 21 seconds).  At about 7:37 p.m., another call was made from defendant's parents' phone to Kristine's home phone.  This call was two minutes and two seconds long.  At 8:16 p.m., a call was made from defendant's cell phone to Kristine's home phone.  This call lasted for 490 seconds (eight minutes and 10 seconds).

Forensic psychiatrist John Chamberlain testified for the defense at trial.  He explained that defendant had a history of problems coping with stress, and defendant used alcohol as a coping mechanism.  Defendant's troubled relationship with Kristine created a lot of stress.  Defendant's trial counsel asked Chamberlain an extended hypothetical question based on the facts of this case and inquired whether a person experiencing what defendant had experienced and doing what defendant did "could ... be described as acting impulsively?"  Chamberlain responded affirmatively.  He explained that such a person "would be vulnerable to acutely decompensating" and "could acutely decompensate."  Chamberlain also testified that a person who experienced a traumatic event might experience "dissociative amnesia," meaning that the person would be unable to access memories of that event.  On cross, Chamberlain conceded that there were "questions about [defendant's] reliability as a historian."  "[H]e gave information that is clearly, at least in some respects, inaccurate."  Chamberlain also admitted on cross that "we can't say what his mental state was."

Defendant's boss testified that he told her that he "had a signed note from Kristine that said that he could move with the kids to Seattle," but defendant did not testify that he had such a note nor did the defense produce such a note.

### III. Procedural Background

Defendant was charged by amended information with murder (Pen.Code, § 187), and it was alleged that he had personally and intentionally discharged a firearm causing death (Pen.Code, § 12022.53, subd. (d)) and personally used a firearm (Pen.Code, § 12022.5, subd. (a)).  At trial, the defense made clear in its opening statement that it sought a verdict of voluntary manslaughter.  In her closing argument, defendant's trial counsel argued to the jury: "So, we know that this is a case about heat of passion because the act that he committed on December 29th of 2008 is so extraordinarily inconsistent with who he is, that it has to be a heat of passion."

After two days of deliberations, the jury returned a first degree murder verdict and found the Penal Code section 12022.53 allegation true.  Defendant moved for a new trial based on prosecutorial misconduct and ineffective assistance of counsel.  The motion was denied.  Defendant was committed to state prison to serve a term of 50 years to life.  He timely filed a notice of appeal.

*People v. Tilbury*, No. H036579, 2013 WL 4813164, at *1-7 (Cal. Ct. App. Sept. 10, 2013)

(footnotes omitted).

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

# III. DISCUSSION

**A.    Standard of Review**

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state courts adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  *Williams*, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

Here, as noted, the California Supreme Court summarily denied petitioner's petition for review. The California Court of Appeal, in its opinion on direct review, addressed eight of the claims petitioner raises in the instant petition. The court of appeal thus was the highest court to have reviewed the claims in a reasoned decision, and, as to those claims, it is the court of appeal's decision that this Court reviews herein. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). The remaining claims were presented only in petitioner's state petition for writ of habeas corpus, which was summarily denied. When presented with a state court decision that is unaccompanied by a rationale for its conclusions, a federal court must conduct an independent review of the record to determine whether the state court decision is objectively reasonable. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). This "[i]ndependent review . . . is not de novo review of the constitutional issue, but rather, the only method by which [a federal court] can determine whether a silent state court decision is objectively unreasonable." *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *See Harrington v. Richter*, 562 U.S. 86, 98 (2011).

**B.      Petitioner's Claims**

Petitioner asserts the following grounds for relief: (1) his rights were violated by the trial court's failure to define the term "provocation" in the manslaughter instruction; (2) the trial court erred by refusing to modify the jury instructions on murder and manslaughter as requested by trial counsel; (3) the trial court erred by using a murder instruction that did not include lack of

provocation as an element of murder; (4) the trial court committed structural error by refusing in advance to answer questions from the jury; (5) the trial court deprived him of his right to present a defense by excluding evidence regarding petitioner's concerns about his children's welfare; (6) there was insufficient evidence to establish the malice element; (7) the trial court violated his rights by not permitting trial counsel to conduct voir dire on the jury's predisposition regarding manslaughter; (8) cumulative error of the above claims; (9) ineffective assistance of counsel due to the failure to assert an unconsciousness defense; (10) ineffective assistance of counsel due to the failure to object to the admission of irrelevant and prejudicial evidence; (11) ineffective assistance of counsel due to the failure to object to the prosecutor's misconduct in closing argument; and (12) cumulative error arising from trial counsel's errors.

### 1.    Lack of Definition of Provocation

Petitioner claims that he was deprived of his due process rights by the trial court's failure to define the term "provocation" in the manslaughter instruction.  Petition at 13.[4]  The California Court of Appeal summarized and rejected this claim as follows:

> The voluntary manslaughter instruction told the jury: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.  [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] The defendant was provoked; [¶] As a result of the provocation, the defendant acted rashly or under the influence of intense emotion that obscured his reasoning or judgment; [¶] And [¶] The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.  [¶] Heat of passion does not require anger, rage, or any specific emotion.  It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.  [¶] In order for heat of passion to reduce murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it.  While no specific type of provocation is required, slight or remote provocation is not sufficient.  Sufficient provocation may occur over a short or a long period of time.  [¶] It is not enough that the defendant simply was provoked....  In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.  [¶] If enough time passed between the provocation and the killing for a person of average disposition to cool off and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on that basis.  [¶] The People have the burden of proving beyond a reasonable doubt the

---

[4] References to the petition are to the page numbers that are automatically assigned by the Court's electronic filing system and appear in the upper right-hand corner of the page.

United States District Court
Northern District of California

1    defendant did not kill as a result of a sudden quarrel or in the heat of passion.  If the People
     have not met this burden, you must find the defendant not guilty of murder."  The words
2    "provoked" and "provocation" were not defined in the jury instructions.

3    "A word or phrase having a technical, legal meaning requiring clarification by the court is
     one that has a definition that differs from its nonlegal meaning."  (*People v. Estrada* (1995)
4    11 Cal.4th 568, 574.)  The "nonlegal meaning" or common meaning of "provoke" is "to
     incite to anger" or "to stir up purposely."  (Merriam–Webster's Collegiate Dict.(10th
5    ed.1993) p. 940; *People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1334.)  Similarly, the
     common meaning of "provocation" is "incitement" or "something that provokes, arouses,
6    or stimulates."  (Merriam–Webster's Collegiate Dict. (10th ed.1993) p. 940; *Hernandez*, at
     p. 1334.)  "'Provocation, as the term is used in law, means that treatment of one person by
7    another which arouses passion and anger.'"  (*People v. Thomas* (1945) 25 Cal.2d 880, 894,
     903.)
8

9    Defendant argues that provocation, as it is used in the law in the voluntary manslaughter
10   context, "has [a] more subtle meaning" which includes "purely verbal conduct."  Nothing
     in the common meaning of "provocation" excludes "purely verbal conduct."  And nothing
11   in the court's instructions suggested that "provocation," in the legal context, did not
     include "purely verbal conduct."  The jury was explicitly told that "no specific type of
12   provocation is required."  Defendant claims that the court's instruction did not provide the
     jury with a standard it could use to distinguish verbal conduct that does constitute
13   provocation from that which does not.  Not so.  The court's instruction provided precisely
     such standards.  The jury was told both that "slight or remote provocation is not
14   sufficient," and that, in determining whether the provocation was sufficient, it should look
     to whether the provocation would have caused "a person of average disposition" to "react
15   [ ] from passion rather than from judgment."  We fail to see any relevance in defendant's
     reference to the "maxim" that "'sticks and stones may break my bones but words will
16   never hurt me.'"  Jurors are assumed to be intelligent adults who will follow the court's
     instructions, and we may presume that they did not substitute an unreferenced "maxim" as
17   their guide.  (*People v. Gonzales* (2011) 51 Cal.4th 894, 940 ["It is fundamental that jurors
     are presumed to be intelligent and capable of understanding and applying the court's
18   instruction."].)  The trial court was not obligated to instruct the jury on the meaning of the
     word provocation as that word has no technical legal meaning that it is different than its
19   common meaning.
20
21   *People v. Tilbury*, 2013 WL 4813164, at *18-19 (footnote omitted).

22        A challenge to a jury instruction solely as an error under state law does not state a claim

23   cognizable in federal habeas corpus proceedings.  *See Estelle v. McGuire*, 502 U.S. 62, 71-72

24   (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show

25   that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates

26   due process.'"  *Id.* at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  The instruction

27   may not be judged in artificial isolation, but must be considered in the context of the instructions

28   as a whole and the trial record.  *Id.*  Petitioner also must show actual prejudice from the error, i.e.,

United States District Court
Northern District of California

12

that the error had a substantial and injurious effect or influence in determining the jury's verdict, before the court may grant federal habeas relief.  *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  The failure of a state trial court to instruct on lesser-included offenses in a noncapital case does not present a federal constitutional claim.  *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000).

Applying these legal principles to petitioner's current allegations, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 2.    Rejection of Pinpoint Instructions

Petitioner claims that the trial court's refusal to give two requested pinpoint instructions violated his right to due process.  Petition at 14.  The California Court of Appeal summarized and rejected this claim as follows:

> The defense asked the court to instruct the jury that "[i]n deciding the sufficiency of the provocation for voluntary manslaughter, the average person need not be provoked to kill, just to act rashly and without deliberation."  The defense also asked the court to instruct the jury: "The quantity of wounds does not, in itself, support a finding that defenda[n]t acted with premeditation or deliberation."  (Capitalization omitted.)  The prosecution opposed both requests.  The court acknowledged that "the defendant is generally entitled to pinpoint instructions in certain circumstances," but such instructions were not required if "they are argumentative," "duplicative," or "confusing."  The court rejected the proposed provocation instruction as duplicative.  It found that the proposed "quantity-of-wounds" instruction "does appear to be a correct statement of law," but it declined to give it because "to focus on this one specific piece of evidence and highlight it, it seemed inappropriate."
>
> "A trial court is not required to give pinpoint instructions that merely duplicate other instructions."  (*People v. Panah* (2005) 35 Cal.4th 395, 486.)  The trial court's instructions explicitly informed the jury that the "heat of passion" requirement was not limited to any "specific emotion" such as "anger" or "rage."  It could be "any violent or intense emotion."  These instructions also told the jury that the objective component required only that "[t]he provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."  By emphasizing that the emotion could be of any type that would cause an ordinary person to "act rashly" and "from passion rather than judgment," the court's instructions adequately informed the jury that there was no requirement that an ordinary person would have been provoked to kill.  Therefore, the trial court did not err in concluding that the requested instruction on this point would have been duplicative.
>
> "Upon request, a trial court must give jury instructions 'that "pinpoint [ ] the theory of the

13

defense,'" but it can refuse instructions that highlight "'specific evidence as such.'" [Citations.]  Because the latter type of instruction 'invite[s] the jury to draw inferences favorable to one of the parties from specified items of evidence,' it is considered 'argumentative' and therefore should not be given." (*People v. Earp* (1999) 20 Cal.4th 826, 886.)  "In a proper instruction, '[w]hat is pinpointed is not specific evidence as such, but the theory of the defendant's case.'" (*People v. Wright* (1988) 45 Cal.3d 1126, 1137.) "[I]nstructions that attempt to relate particular facts to a legal issue are generally objectionable as argumentative [citation], and the effect of certain facts on identified theories 'is best left to argument by counsel, cross-examination of the witnesses, and expert testimony where appropriate.'" (*People v. Wharton* (1991) 53 Cal.3d 522, 570.) The requested "quantity-of-wounds" instruction was an attempt to relate particular facts to a legal issue.  The proposed instruction pinpointed specific evidence, the wounds to Kristine's body.  Instead of identifying a defense theory to which that evidence related, the import of the proposed instruction was an argument that this evidence did not support the prosecution's theory.  The trial court correctly concluded that it was not obligated to give the proposed instruction because it was argumentative.

*People v. Tilbury*, 2013 WL 4813164, at *19.

A defendant is entitled to an instruction on a theory of defense only "if the theory is legally cognizable and there is evidence upon which the jury could rationally find for the defendant." *United States v. Boulware*, 558 F.3d 971, 974 (9th Cir. 2009) (internal quotation marks omitted). Due process does not require an instruction be given unless the evidence supports it.  *See Hopper v. Evans*, 456 U.S. 605, 611 (1982) (holding instruction on lesser-included offense required only "when the evidence warrants such an instruction").  Moreover, "[a] state trial court's refusal to give [a requested] instruction does not alone raise a ground cognizable in a federal habeas corpus proceeding."  *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988) (quotation marks omitted). "The error must so infect the entire trial" that the petitioner was deprived of the fair trial guaranteed by the Fourteenth Amendment.  *Id.*  "Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury." *Duckett v. Godinez*, 67 F.3d 734, 745 (9th Cir. 1995).  "A 'theory of defense' instruction need not be given when it is simply a recitation of the facts told from the defendant's perspective." *United States v. Parker*, 991 F.2d 1493, 1497 (9th Cir. 1993) (*citing United States v. Nevitt*, 563 F.2d 406, 409 (9th Cir. 1977)).  It is proper to reject a proposed instruction that is "more like a closing argument than a statement of applicable law." *Id.*

The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *Walker v. Endell*, 850 F.2d 470, 475-76 (9th Cir. 1987).  A habeas petitioner whose claim

United States District Court
Northern District of California

involves a failure to give a particular instruction, as opposed to a claim that involves a misstatement of the law in an instruction, bears an "'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)).

Applying these legal principles and those outlined above to petitioner's current allegations, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

Accordingly, petitioner is not entitled to habeas relief on this claim.

**3.   Adequacy of Murder Instructions**

Petitioner claims that he was deprived of due process because the murder instructions did not provide that lack of provocation is an element of murder. Petition at 16. The California Court of Appeal summarized and rejected this claim as follows:

> Defendant maintains that the court's instructions on murder were inadequate because they did not include as an element of murder "the absence of provocation." He concedes that the court's instructions on voluntary manslaughter told the jury that the prosecution had the burden of disproving heat of passion and that defendant could not be convicted of murder unless the prosecution satisfied this burden. He maintains that the error was in the location of the instruction.

> The trial court's introduction to the murder instructions was as follows: "Homicide is the killing of one human being by another. Murder and manslaughter are types of homicide. The defendant is charged with murder. Manslaughter is a lesser offense to murder." The court then instructed the jury on the elements of murder. These instructions were followed by instructions on how the jury was to determine the degree of murder. "If you decide that the defendant has committed murder, you must then decide whether it is murder in the first degree or murder in the second degree." The jury was then told that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." These instructions on the degree of murder were immediately followed by instructions on the impact of provocation. "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter." This instruction was immediately followed by the voluntary manslaughter instructions. The voluntary manslaughter instructions told the jury: "The People have the burden of proving beyond a reasonable doubt the defendant did not kill as a result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder." (Italics added.) The jury was told that it could "consider these different kinds of

15

homicide in whatever order you wish...."

Defendant argues that, due to the fact that the jury was told that it could consider the "different kinds of homicide in whatever order you wish," it may have considered only the murder instructions, ignored the voluntary manslaughter instructions, and found defendant guilty of murder without ever considering whether the prosecution had proved the "absence of provocation."

We assume that defendant is actually contending, as he did below, that the murder instructions were required to include as an element that the prosecution must disprove heat of passion. Of course, the court's instructions as a whole did not omit mention of this burden. This burden was explicitly spelled out in CALCRIM No. 570. Defendant's claim is that the placement of the instruction on the prosecution's burden at the end of the instructions about the elements of voluntary manslaughter was so divorced from the murder instructions that the jury might not have considered that burden in reaching a murder verdict.

As we pointed out earlier, "the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." (*People v. Burgener*, *supra*, 41 Cal.3d at p. 538.) Where the claim is that the jury might have been misled, "we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." (*Estelle v. McGuire*, *supra*, 502 U.S. at p. 72.)

A consideration of the entire charge debunks defendant's claim that the trial court's instructions possibly could have misled the jury about the prosecution's burden of proving that defendant did not kill in the heat of passion. The murder and manslaughter instructions were not divorced from each other but were parts of a continuous stream of interrelated instructions that necessarily required the jury to consider these instructions as a whole. The jury could not determine the degree of murder without considering whether provocation occurred. It could not determine whether provocation occurred without proceeding beyond the murder instruction. CALCRIM No. 570, which immediately followed these instructions, explicitly told the jury that it was required to find defendant not guilty "of murder" if the prosecution failed to meet its burden of disproving heat of passion. While the jurors were told that they could consider the offenses in any order, they were never told, nor was it ever suggested by the court or counsel, that they could ignore any portion of the instructions.

Furthermore, the arguments of counsel, particularly that of the prosecutor, emphasized that the prosecutor bore the burden of proving that defendant had not acted in the heat of passion. (*People v. Mills* (2012) 55 Cal.4th 663, 680 [no error in instructions if prosecutor's argument clarified any ambiguity].) The prosecutor told the jury in her opening argument: "it is my burden not only to prove to you that it's a murder and what degree it is, but *it's the People's burden to prove that this was not a crime that happened as a result of provocation or upon a sudden quarrel*." (Italics added.) Defendant's trial counsel's argument reiterated this point: "[W]hat is also clear [is] that the prosecution has to prove beyond a reasonable doubt that this is not a case of heat of passion. That's the law. And because they have this burden, and because heat of passion negates malice, it makes sense that you begin your evaluation and your analysis with determining did the

prosecution prove beyond a reasonable doubt that this is not about heat of passion." "So, because the burden is on the prosecution to eliminate sudden quarrel or heat of passion, it makes sense that you do so before you reach your analysis or before you get to the point of discussing whether or not this was first or second degree murder." "They have to show Mr. Tilbury was not provoked." The prosecutor confirmed this in her closing argument. "It was also my responsibility to prove there is no provocation." "What provocation is there? [¶] Yes, it's my burden to disprove it. I did. There is none."

When we view the entirety of the instructions in light of counsel's arguments, we see no possibility that the jury failed to understand that the prosecution bore the burden of disproving heat of passion in order to establish that the offense was murder.

*People v. Tilbury*, 2013 WL 4813164, at *20-21 (footnote omitted).

Applying the legal principles on jury instructions outlined above to petitioner's current allegations, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Petitioner contends that "[u]nder the strict prohibitory terms of CALCRIM No. 640, the jury was constrained to pass upon the question of whether the prosecution had proved all the elements of first-degree murder, without giving any consideration whatsoever to the manslaughter instructions." Petition at 17-18. To the contrary, in instructing the jury under CALCRIM 640, the trial court instructed, "you may consider these different kinds of homicide in whatever order you wish." Ex. 1 at 518, Ex. 4 at 1678.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 4.     Court's Statement to Jury

Petitioner claims that the trial court committed structural error and violated due process by refusing in advance to answer questions from the jury. Petition at 19. The California Court of Appeal summarized and rejected this claim as follows:

#### *1. Background*

Just before the court instructed the jury, it told the jurors: "[O]f course, while you are deliberating, if you have any questions about the instructions, you can certainly ask questions about them." At the beginning of the instructions, the court told the jury: "Some words or phrases used during this trial have legal meanings that are different from their meanings in everyday use. These words and phrases will be specifically defined in these instructions. Please be sure to listen carefully and follow the definitions that I give you. Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings."

After the jury had been instructed and the attorneys had completed their arguments, the

United States District Court
Northern District of California

court told the jury: "If you have questions, I will talk with the attorneys before I answer so it may take some time.  You should continue your deliberations while you wait for my answer.  I will answer any questions in writing or here in open court."  "[R]egarding questions.  Questions are very common for juries to have of the judge during their deliberations.  And questions can be about anything: they can be about the facts of the case; they can be about the legal instructions we talked about; or our schedule.  [¶] A couple of comments about questions, folks.  First of all, as the instructions said back there, there are forms on the desk for you to use.  The foreperson needs to write out the question as legibly as possible, date and sign it, so we can keep a record of all of our communications, and then just knock on the door, let the bailiff know.  That question comes out to me.  [¶] And first of all, my ability to answer your questions may be limited.  For example, it's not uncommon for you as a juror to be sitting there listening to the trial, and saying to yourself: 'I wish the attorneys would ask about this subject.  I wish they would ask this question.  I'm interested in this.'  And it never gets asked.  If you ask that question now, 'please tell me what the weather was like on the 29th,' it was never asked, so I cannot and I'm not in a position it [sic ] to add to the record.  So keep that in mind, also.  [¶] *Also, every so often we'll get questions about better definitions: 'Can you give us a better definition of reasonable doubt?'  And things like that.  Again, I can't do that.  So I'll just refer you back to the legal instruction and tell you to discuss it with the other jurors and come to your own conclusions about that.*"  (Italics added.)

### 2. Analysis

Defendant claims that the court's "peremptory declaration that it would offer no clarification if the jurors were confused about the definition of technical terms" was instructional error that violated Penal Code section 1138 and his federal constitutional rights.

Penal Code section 1138 provides: "After the jur[ors] have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court.  Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

In *People v. Beardslee* (1991) 53 Cal.3d 68 (*Beardslee*), a jury inquired about the definition of premeditation and deliberation, and the court told the jury that it would not explain any of the jury instructions.  On appeal, the defendant claimed that the trial court had violated Penal Code section 1138.  (*Beardslee*, at pp. 96-97.)  The California Supreme Court held that the court's response was erroneous.  "The court has a primary duty to help the jury understand the legal principles it is asked to apply.... This does not mean the court must always elaborate on the standard instructions.  Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.... It must at least consider how it can best aid the jury.  It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given."  (*Beardslee*, at p. 97, citations omitted.)  Although the California Supreme Court found that the trial court had erred, it concluded that the error

was harmless because any ambiguity in the instructions would have favored rather than prejudiced the defendant, and it was mere "speculation" that the court's response might have discouraged the jury from asking further questions.  (*Beardslee*, at pp. 97–98.)

This case, unlike *Beardslee*, does not involve a trial court's refusal to explain any jury instructions. The trial court in this case expressly told the jury that it would respond to jury questions about the instructions.  "[I]f you have any questions about the instructions, you can certainly ask questions about them."  "I will answer any questions in writing or here in open court."  The court merely informed the jury that it would be unable to improve on the definitions of "reasonable doubt" and "things like that."  This was an appropriate exercise of the court's discretion under Penal Code section 1138 as the instructions on reasonable doubt are "full and complete," and deviations from those instructions almost invariably result in claims of error.  (See *People v. Johnson* (2004) 119 Cal.App.4th 976, 986.)  While the trial court did not specify which other "definitions" were "like" "reasonable doubt," we see no likelihood that the court's comments about questions as a whole, which noted that the court would entertain "any questions about the instructions," amounted to an advance refusal to comply with Penal Code section 1138.

Nor do we find any violation of defendant's federal constitutional rights.  "It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction."  (*People v. Burgener* (1986) 41 Cal.3d 505, 538, disapproved on another point in *People v. Reyes* (1998) 19 Cal.4th 743, 756.)  "[An] instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record.  [Citation.]  In addition, in reviewing an ambiguous instruction such as the one at issue here, we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."  (*Estelle v. McGuire* (1991) 502 U.S. 62, 72.)

Since the court explicitly told the jury that it would entertain "any questions about the instructions," it was not reasonably likely that the jury would have understood the court's comment about its lack of a "better definition" of "reasonable doubt" and "things like that" to mean that the court would be unwilling to respond to jury questions about any other technical terms.  Indeed, the court did not say that it would not respond to questions about such matters but only let the jury know that the instructions contained the best available definitions of terms like reasonable doubt.  We find no error.

*People v. Tilbury*, 2013 WL 4813164, at *16-18.

A trial judge has wide discretion in charging the jury.  *Arizona v. Johnson*, 351 F.3d 988, 994 (9th Cir. 2003) (finding trial court acted within its discretion by, in response to juror question, simply referring the jury to the instructions they had already been given).  Such discretion "carries over to a trial judge's response to a question from the jury."  *Id.* (citing *Allen v. United States*, 186 F.2d 439, 444 (9th Cir. 1951) ("the giving of additional instructions has always been held to be within the discretion of the trial court")).  Thus, the precise manner by which the court fulfills its

1    obligation to address the jury's difficulties "is a matter committed to its discretion." *Johnson*, 351

2    F.3d at 994.

3          The Supreme Court has clearly established that "unless *all* the jury's findings are vitiated

4    [by an instructional error], harmless error review applies." *Byrd v. Lewis*, 566 F.3d 855, 864 (9th

5    Cir. 2009) (citing *Hedgpeth v. Pulido*, 555 U.S. 57 (2008) and *Neder v. United States*, 527 U.S. 1

6    (1999)). "In *Pulido*, the Court left no doubt that its intent in *Neder* was to limit structural error

7    review to those trial deficiencies that negated all the jury's findings, rather than to a preliminary

8    finding that merely contributed to the ultimate determination of guilt." *Byrd*, 566 F.3d at 864.

9    Further, "[t]he only instructional error recognized by *Pulido* as vitiating all the jury's findings is a

10   defective overarching reasonable-doubt instruction." *Id.* at 867.

11         Applying these legal principles and those outlined above to petitioner's current allegations,

12   the state court's rejection of this claim was not contrary to, or an unreasonable application of,

13   clearly established Supreme Court precedent.

14         Accordingly, petitioner is not entitled to habeas relief on this claim.

15   **5.    Exclusion of Defense Evidence**

16         Petitioner claims that his right to present a complete defense was violated by the exclusion

17   of evidence that: (1) Gonzales, the victim's live-in boyfriend, had four prior drug convictions,

18   (2) the victim, Kristine, had committed welfare fraud, and (3) a neighbor complained about

19   unsanitary conditions at Kristine's home.  Petition at 20.  The California Court of Appeal

20   summarized and rejected this claim as follows:

21         Defendant sought admission of evidence that Kristine had received food stamps to which
         she was not entitled (welfare fraud) in 2008, that a neighbor had complained of unsanitary
22         conditions at Kristine's home (neighbor complaint) in 2008, and that Gonzales had been
         convicted of narcotics offenses (drug convictions) in 2007 and 2009.  He conceded that he
23         was unaware of the welfare fraud, the neighbor complaint, and the drug convictions, but he
         claimed that this evidence was nevertheless relevant to corroborate his testimony that his
24         state of mind at the time of the shooting arose from his concerns about the boys' welfare in
         Kristine's care.  The trial court excluded this evidence on relevance and Evidence Code
25         section 352 grounds, and he claims that its exclusion was prejudicial error.

26

27                              *1. Background*

28   The defense sought admission of this evidence, and the prosecution objected on relevance

United States District Court
Northern District of California

20

and Evidence Code section 352 grounds. The prosecution asserted that none of this evidence was admissible because defendant was unaware of it.

The defense claimed that evidence of Kristine's "dishonesty" (the welfare fraud) was admissible to "guard against the attacks on Daniel's credibility on cross-examination." The court excluded the welfare fraud evidence on relevance and Evidence Code section 352 grounds.

Defendant's trial counsel argued that evidence of the neighbor complaint and the drug convictions needed to come in because it "corroborates my client's subjective belief that he had legitimate reason to suspect that his children were not being cared for. It wasn't just a theory or a paranoid delusion that he was having, that his concerns were grounded in circumstances that did take place." The defense urged that evidence of Gonzales's prior "drug use and careless/reckless behavior while in the presence of the children," would be relevant "1. To corroborate the reasonableness of Daniel Tilbury's subjective belief that his children were in a hazardous environment while living with Kristine and [Gonzales]. [¶] 2. To support Daniel's overall defense that he killed Kristine while in a state of intense emotion caused by his fear and pain in losing his children to her and the unhealthy life she would provide them. [¶] 3. To undermine the prosecution's claim that Daniel's actions were premeditated and not the product of emotion." The defense claimed that this evidence was relevant to defendant's "state of mind on the date of the incident."

Defendant's trial counsel argued that evidence of things that defendant was not aware of was relevant to corroborate his testimony and thereby support his credibility. Defendant's trial counsel argued: "I feel that it would be important to corroborate some of this information because I recognize that my client's testimony will be critical to our defense, and whether he is believed or not will be the most important part of our defense. [¶] And if we—if the only thing that I am able to produce is his testimony and I'm not allowed to corroborate anything that he is saying...." The defense wanted to call Gonzales as a witness and ask him about the convictions.

Defendant's trial counsel argued that "it makes a tremendous difference if that belief is corroborated because there is other objective information to show that, yes, in fact, Mr. Gonzale[s] was, in fact, using drugs during this period. It wasn't just a figment of my client's imagination, that Mr. Tilbury had some basis to have this concern." "[H]is beliefs will be undermined if we are prevented from providing independent verification that these things did happen or that these things did have some validity. [¶] And so I think they are relevant because they corroborate his belief ... and give him greater credibility...."

The prosecutor argued that "he's not entitled to greater credibility." She insisted that evidence of "something that he did not know about ... is irrelevant for that purpose."

The court found that evidence of things that defendant did not know of would not be directly relevant to his state of mind, but it recognized that the defense might "need some corroboration with regard to the claims that your client made." However, the court saw little relevance or need for this evidence. "I don't imagine that the district attorney would be trying to impeach your client's credibility with regard to that aspect...." The court acknowledged that this kind of evidence "lends some veracity to" defendant's claims. However, the court reiterated that defendant had to have had "knowledge of it...."

21

United States District Court
Northern District of California

The court ruled that the neighbor complaint and drug convictions evidence was inadmissible. "I don't know why it is that Mr. Tilbury felt that Fabian Gonzale[s] was a druggy. I don't know what the basis of that is, but the offer of proof was that he was unaware that he, in fact, had criminal convictions for that. [¶] ... [¶] But for independent evidence of criminal convictions that he was unaware of to come in to corroborate, I think that would be improper." "[I]f [defendant] was not aware of [the neighbor] having made a formal complaint at the time the homicide went down, then, again, he cannot argue that that was the corroborating evidence or that that was the basis of his state of mind."

The court found that the neighbor complaint and drug convictions evidence was both irrelevant and more prejudicial than probative under Evidence Code section 352.7 "[I]f he wasn't aware of it, it's not relevant to his state of mind. [¶] And number two, on 352 grounds ... I think the probative value would be minimal, if arguable, if existing at all, I think would be outweighed by the danger that it would confuse the jury with regard to the issues in the case, and then could potentially take more time than we need to be taking on those things."

When defendant testified, the court instructed the jury: "[Defendant] would be testifying to certain evidence that would be admitted solely for how it impacted his state of mind for no other purpose." As an example, the court identified his testimony that Kristine admitted using drugs. "So, when [defendant] makes reference to what people told him about certain things, that's hearsay. It's not admitted for the truth of the matter ...; but it is admitted as it affects his state of mind, because his state of mind is relevant here."

Defendant's mother testified that defendant had talked to her "about the drug-dealing that was going on" at Kristine's home, and she said "[t]hat worried all of us." She also testified that she had heard of the "drug-dealing" "through a few different people" including defendant, "but it was all secondhand information." A Los Banos police officer testified that defendant had contacted the police in August 2005 to report that there were people at Kristine's home "possibly using drugs" and expressed concerns about "the safety of his children." A neighbor of Kristine testified that he had broken up an altercation between Gonzales and a housemate in front of the house that the children were witnessing. A coworker and friend of defendant testified that, when defendant found out about Kristine's affair with Gonzales, he told the coworker that Kristine's affair was with a "loser drug-dealer guy" and that he was "concerned about his kids being in that environment." Defendant's former boss testified that defendant had told her that Kristine was "using drugs" and living with "a drug dealer," and that defendant had seen "syringes and things" in their home.

### *2. Analysis*

Defendant claims that the trial court erred in finding the proffered evidence irrelevant. He claims that the welfare fraud evidence would have corroborated his testimony that Kristine lied, that the neighbor complaint evidence would have corroborated his testimony that Kristine's house was unsanitary, and that the drug convictions evidence would have corroborated his testimony that Gonzales was a drug user.

United States District Court
Northern District of California

The problem with defendant's claim is that the trial court also excluded this evidence under Evidence Code section 352 on the ground that its "minimal" probative value was "outweighed by the danger that it would confuse the jury with regard to the issues in the case, and then could potentially take more time than we need to be taking on those things." A trial court has the discretion to exclude evidence pursuant to Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid.Code, § 352.) We review the trial court's ruling under Evidence Code section 352 for abuse of discretion. (*People v. Holloway* (2004) 33 Cal.4th 96, 134.)

Defendant maintains that this evidence had significant probative value to corroborate his testimony that he believed that the boys were in danger in Kristine's home. He argues that this evidence "went to the objective component of the heat of passion which reduces murder to manslaughter, which must be such 'as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances.'" The objective component of heat of passion voluntary manslaughter requires that the "provocation," that is, the circumstances giving rise to the heat of passion that actually (subjectively) provoked the killer's act, must also be objectively sufficient to cause an ordinary person to act rashly. (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.) The question before the jury on the objective component was whether the beliefs that defendant asserted had provoked his act would have provoked an ordinary person to act rashly. This component does not focus on whether defendant's beliefs were true but on whether a[n] ordinary person who believed such things would act rashly. The excluded evidence would not have addressed that issue.

The trial court reasonably concluded that the truth of defendant's beliefs that Kristine lied, that her house was unsanitary, and that Gonzales was a drug dealer were not in significant controversy. "I don't imagine that the district attorney would be trying to impeach your client's credibility with regard to that aspect...." In fact, the prosecutor never attacked either the existence or the legitimacy of defendant's beliefs that Kristine was deceitful, that her home was unkempt, or that Gonzales was a drug dealer. Defendant argues otherwise and relies on a passage from the prosecutor's argument to the jury. His reliance is misplaced. That passage was directed at defendant's testimony that Kristine was a drug user, an assertion that would not have been corroborated by any of the excluded evidence.

Because there was no controversy about the issues addressed by the excluded evidence, this evidence was cumulative and had little probative value to forestall an imaginary attempt by the prosecutor to argue that defendant had fabricated his testimony about these three beliefs. The defense presented uncontested evidence that defendant's beliefs in this regard predated the shooting by years. Defendant had long complained to his parents, friends, and coworkers about Kristine's lies, the unsanitary condition of her house, and Gonzales's drug dealing. Indeed, a police officer testified that defendant had complained to the police about drug use at Kristine's home three years prior to the shooting. In this context, the trial court could have reasonably concluded that the challenged evidence had little probative value on the issue of defendant's state of mind at the time of the shooting.

On the other side of the balance, admission of the excluded evidence would have diverted the jury's attention and sidetracked its focus from defendant's state of mind, the key issue in the case, to the validity of his beliefs, an irrelevancy. None of the excluded evidence

would have unerringly validated any of defendant's beliefs.  Evidence that Kristine accepted food stamps to which she was not entitled did not prove that she lied to defendant.  The neighbor's complaint did not prove that her home was unsafe for the children.  And Gonzales's drug possession convictions did not prove that he was a drug dealer or that there were drugs in Kristine's home.  Admitting evidence on these points posed a danger of distracting the jury from its proper role and potentially triggering a mini-trial on these tangential points.  Thus, the trial court could reasonably conclude that admission of the excluded evidence would be unduly time-consuming and confusing to the jury.

We accord substantial deference to a trial court's balancing of the probative value of the challenged evidence against the potential for jury confusion and undue time consumption.  Since the challenged evidence had minimal probative value and there was a substantial risk of undue time consumption and jury confusion, we can find no abuse of discretion in the trial court's ruling.

Defendant also claims that the exclusion of this evidence violated his right to due process and to present a defense.  "Evidence Code section 352 must yield to a defendant's due process right to a fair trial and to the right to present all relevant evidence of significant probative value to his or her defense.  [Citation.]  [¶]  Although the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right."  (*People v. Cunningham* (2001) 25 Cal.4th 926, 999; see also *People v. Snow* (2003) 30 Cal.4th 43, 90.)  As the excluded evidence had little probative value and did not address a significant issue, the trial court's ruling did not violate defendant's right to due process or his right to present a defense.

*People v. Tilbury*, 2013 WL 4813164, at *11-14 (footnotes omitted).

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fair trial guaranteed by due process.  *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991).  Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Jammal*, 926 F.2d at 919.  While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated.  *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983).

"[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."  *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (alteration in original) (quotation marks omitted); *see also Montana v. Egelhoff*, 518 U.S.

24

37, 42 (1996) (due process does not guarantee a defendant the right to present all relevant evidence).  "[T]he introduction of relevant evidence can be limited by the State for a valid reason."  *Montana*, 518 U.S. at 53 (internal quotation marks omitted).  But this latitude is limited by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments.  *Holmes*, 547 U.S. at 324.  Due process is violated only where the excluded evidence had "persuasive assurances of trustworthiness" and was critical to the defense.  *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).  "Only rarely [has the Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence."  *Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013).

Applying these legal principles to petitioner's current allegations, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  Petitioner has not shown that the trial court's refusal to admit the excluded evidence denied him the fundamental right to present a defense.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 6.     Evidence of Malice

Petitioner claims there was insufficient evidence to prove malice as a required element of first degree murder.  Petition at 23.  The California Court of Appeal summarized and rejected this claim as follows:

Defendant claims that the prosecution failed to present substantial evidence of malice.

"'[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  (*People v. Johnson* (1980) 26 Cal.3d 557, 576, quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.)  "[The] appellate court must view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."  (*People v. Reilly* (1970) 3 Cal.3d 421, 425; accord *People v. Pensinger* (1991) 52 Cal.3d 1210, 1237.)  "A reasonable inference, however, 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] ... A finding of fact must be an inference drawn from evidence rather than ... a mere speculation as to probabilities without evidence.'"  (*People v. Morris* (1988) 46 Cal.3d 1, 21.)  A trier of fact may rely on inferences to support a conviction only if those inferences are "of such substantiality that a reasonable trier of fact could determine beyond a reasonable doubt" that the inferred facts are true.  (*People v. Raley* (1992) 2 Cal.4th 870, 890-891.)  "Evidence is sufficient to support a conviction only if it is substantial, that is, if

United States District Court
Northern District of California

it "'reasonably inspires confidence'" [citation], and is 'credible and of solid value.'"
(*Raley*, at p. 891.)

"Where an intentional and unlawful killing occurs 'upon a sudden quarrel or heat of passion' (§ 192, subd. (a)), the malice aforethought required for murder is negated, and the offense is reduced to voluntary manslaughter—a lesser included offense of murder. [Citation.]  Such heat of passion exists only where 'the killer's reason was actually obscured as the result of a strong passion aroused by a "provocation" sufficient to cause an "'ordinary [person] of average disposition ... to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'"' [Citation.]  To satisfy this test, the victim must taunt the defendant or otherwise initiate the provocation."  (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.)

Defendant claims that the fact that he armed himself before going to Kristine's home does not demonstrate malice.  He tries to support this claim by relying on the California Supreme Court's decision in *People v. Bridgehouse* (1956) 47 Cal.2d 406 (*Bridgehouse*). Bridgehouse's wife had been having an affair with Bahr, with Bridgehouse's knowledge, for more than a year before Bridgehouse finally filed for divorce.  (*Id.* at pp. 407-408.) Bridgehouse sought a restraining order prohibiting his wife from associating with Bahr in the presence of their children.  After she was served with the restraining order, the wife asked Bridgehouse to meet her at the family home.  He went to the home and took a nap. When he awoke, his wife told him that she would fight his divorce action, would be willing to lie in doing so, and would kill him if he tried to take their children away from her.  (*Id.* at p. 408.)  Bridgehouse spent the night at the home.  The next day, the wife agreed to Bridgehouse's request for a meeting with Bahr, although no time for the meeting was set.  (*Id.* at pp. 408409.)  Bridgehouse left the family home with his son for a trip to the zoo.  He took his gun, putting it in his belt.  (*Id.* at p. 409.)  Bridgehouse stopped at his mother-in-law's home to pick up some socks for his son.  While he was there, he was shocked to see Bahr sitting and reading in the home's den.  Bahr was living in the home at the time, which Bridgehouse had not known.  Bridgehouse, in shock, shot Bahr to death. (*Id.* at pp. 409, 411-412.)  He claimed that he had no memory of what had led up to the shooting; it was a "mental void."  (*Id.* at p. 410.)

The California Supreme Court, in a fairly brief analysis, credited Bridgehouse's claim that there was insufficient evidence of malice.  "In the case at bar, there was no malice shown, either express or implied; there was no showing of any premeditation, either express or implied; there was no evidence of an 'abandoned and malignant heart.'  There was ample, uncontradicted, evidence that defendant was a man of excellent character; that he was mentally and emotionally exhausted and was white and shaking.  It appears to us, as a matter of law, that under the circumstances here presented there was adequate provocation to provoke in the reasonable man such a heat of passion as would render an ordinary man of average disposition likely to act rashly or without due deliberation and reflection [citation]."  (*Bridgehouse*, supra, 47 Cal.2d at p. 414.)

*Bridgehouse* has no bearing on this case.  The fact that Bridgehouse took his gun with him to his mother-in-law's home was not evidence of malice because the undisputed evidence established that Bridgehouse had no idea that he would encounter Bahr at his mother-in-law's home, went there only to get socks for his son, and was shocked to find Bahr there. Thus, the fact that Bridgehouse had a weapon on his person was mere happenstance.

Furthermore, the fact that Bridgehouse, who had recently left his job as a law enforcement officer, had his service weapon in his belt did not suggest that he intended to use it against Bahr or anyone else.  Nothing in the opinion suggests that the gun was concealed.

In contrast, defendant, after having a contentious telephone conversation with Kristine while she was at her home, drove for 30 minutes to reach her home.  He knew that she was at her home and that he would encounter her if he went there.  Defendant took his gun with him to this expected encounter with Kristine, loaded it, and concealed it in his clothing.  The fact that he took a gun, loaded it, concealed it, and drove for 30 minutes to confront Kristine at her home provided more than sufficient evidence that defendant intended to use the gun against Kristine when he arrived at her home.  The fact that he entered the home with a pretense of friendliness before drawing his weapon and shooting Kristine reflected that he was acting deliberately rather than rashly.  Hence, the evidence supported a finding of malice.

*People v. Tilbury*, 2013 WL 4813164, at *7-8.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  Consequently, where a state prisoner alleges the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt, such petitioner states a constitutional claim, *Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *id.* at 324.  For purposes of determining such a claim, the relevant inquiry is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319.  Where the record supports conflicting inferences, a federal habeas court must presume the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.  *Id.* at 326.  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted.  *Id.* at 324.

Applying these legal principles to petitioner's current allegations, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  Based on an independent review of the record, sufficient evidence supported the jury's finding of first degree murder.

Accordingly, petitioner is not entitled to habeas relief on this claim.

//

United States District Court
Northern District of California

7.        **Voir Dire**

Petitioner claims the trial court deprived him of a fair trial and due process by not

permitting defense counsel to conduct voir dire on the prospective jurors' predisposition regarding

manslaughter.  Petition at 26.  The California Court of Appeal summarized and rejected this claim

as follows:

### *1. Background*

Before voir dire, the court told counsel: "I don't necessarily limit voir dire.  You know?
I'm going to do kind of a general one myself, but I know that you may hear things in their
answers or be concerned about things, so unless you want to talk more about the voir dire
process, I'm not going to necessarily limit you on time."  Both counsel were agreeable.
Before voir dire actually began, the court told counsel: "Now, I don't like to limit either
one of you in voir dire.  It's too important of a case ... and you know your case better than I
as far as where you want to go with questions and stuff like that."  Defendant's trial
counsel asked the court what "legal principles" it would "cover" with the jury.  The court
said that it preferred not to cover those areas and also stated: "I'd prefer avoiding those
questions that kind of trap the jury into making some type of a commitment based on not
having enough information...."  "I would be happy to if you want specific legal instructions
that you want me to kind of explain to them, but I'm also happy if either one of you wants
to do it and cover yourself."

Voir dire commenced on November 10, 2010.  Before voir dire commenced that day, the
defense filed a motion requesting that the court ask the prospective jurors the following:
"The law recognizes and defines various forms of unlawful homicide or killing.  (CALJIC
8.00) [¶] One of those forms includes voluntary manslaughter.  (CALJIC 8.00) [¶] A
voluntary manslaughter occurs when someone unlawfully kills in the heat of passion or
upon a sudden quarrel that amounts to adequate provocation.  (CALJIC 8.50; 8.42; 8.40)
[¶] 1. Do you understand that?  [¶] 2. Do you agre[e] with this principle of law?  [¶] 3. Will
you follow this principle of law if so instructed?  [¶] Even if an intent to kill exists, it can
still be a voluntary manslaughter so long as the killing occurred in the heat of passion or
upon a sudden quarrel with adequate provocation.  (CALJIC 8.50.)  [¶] 1. Do you
understand that?  [¶] 2. Do you agre[e] with this principle of law?  [¶] 3. Will you follow
this principle of law if so instructed?"  (Capitalization omitted.)

The defense request was not discussed on the record at that time, but it was discussed in
chambers and, after the jury had been selected, the court made a record of those
discussions.  The prosecution had opposed the request.  The court noted that it had "made a
preliminary ruling, basically denying your request that these particular questions that are
included in your document be read to the jury."  The court explained its reasoning for
denying the request.  "So, counsel, the reason the court denied it, basically, is the court is
mindful of the Code of Civil Procedures, it's 222.54 and 223 with regard to what is and is
not appropriate voir dire.  [¶] Both code sections identified what they consider improper
questions.  They would include: [¶] Those whose purpose is to pre-condition jurors to a
particular result; [¶] Those that would indoctrinate the jury on the lawyers' theories of the

case; [¶] And those questions—questioning jurors on the pleadings and the applicable law. [¶] I think these, while the court does give counsel some leeway to discuss legal concepts such as burden of proof and presumption of innocence, things like that, I thought these questions were a little bit too pointed with regard to improper questions, so the court declined to allow them to be read to the jury."

During voir dire, the court told the prospective jurors: "There's going to be an instruction that sounds very simple on its face that you're going to be required to follow and it says, very simply, you're required to follow the law that I tell you applies to this case whether you agree with that law or not.  [¶] Now, very simple on its face.  And I don't think there's going to be much problem because when I say you have to follow the law whether you agree with it or not, most people says [sic ], 'well, what if I disagree with it?'  That's probably not going to happen."  "[Y]ou have to follow the law as I tell you it applies in the case whether you agree with it or not.  You have to follow the definitions, if you will, that I give you.  [¶] Are you all comfortable with that?"  "Also, you might hear other words that you're not familiar with, the concept of voluntary manslaughter.  The law recognizes that there are different degrees or different levels of unlawful homicides or killings.  They all have legal definitions.  They'll all be defined for you if they become relevant in the case.  [¶] And I just need to be assured that you'll listen to them, you'll talk about them because you'll be on the same jury, and that you'll follow the definitions that I give you.  Are you all okay with that?  Okay."

After the close of evidence, the jury was instructed: "You must follow the law as I explain it to you, even if you disagree with it."

### *2. Analysis*

"In a criminal case, the court shall conduct an initial examination of prospective jurors.  The court may submit to the prospective jurors additional questions requested by the parties as it deems proper.  Upon completion of the court's initial examination, counsel for each party shall have the right to examine, by oral and direct questioning, any or all of the prospective jurors.  The court may, in the exercise of its discretion, limit the oral and direct questioning of prospective jurors by counsel....  [¶] The trial court's exercise of its discretion in the manner in which voir dire is conducted, including any limitation on the time which will be allowed for direct questioning of prospective jurors by counsel and any determination that a question is not in aid of the exercise of challenges for cause, shall not cause any conviction to be reversed unless the exercise of that discretion has resulted in a miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution."  (Code Civ. Proc., § 223.)

"The trial court has considerable discretion in determining the scope of voir dire."  (*People v. Williams* (2006) 40 Cal.4th 287, 307.)  "An appellate court applies the abuse of discretion standard of review to a trial court's conduct of the voir dire of prospective jurors.  (See Code Civ. Proc., § 223.)  A trial court abuses its discretion when its ruling ' "fall[s] 'outside the bounds of reason.' " ' " (*People v. Benavides* (2005) 35 Cal.4th 69, 88.)

Here, the trial court's decision to preclude the proposed questions was based on its

conclusion that the proposed questions were improper because they were "a little bit too pointed" in attempting to "pre-condition jurors to a particular result" or "indoctrinate the jury" on the defense theory of the case.  The court's ruling was not unreasonable.  The proposed questions rather pointedly sought to instruct the prospective jurors on the law and to preview the basis for the defense theory of the case.  The sole purpose of voir dire in a criminal case under Code of Civil Procedure section 223 is to uncover hidden bias in support of a potential challenge for cause.  Voir dire may not be used to "instruct the jury in matters of law."  (*People v. Tate* (2010) 49 Cal.4th 635, 657.)  So long as the prospective jurors were willing to follow the court's instructions, their "understand[ing]" of these concepts at this early stage and their personal agreement or disagreement with them could not form the basis for a challenge for cause.  Consequently, it did not come within the limited scope of the voir dire permitted by Code of Civil Procedure section 223.

The trial court's voir dire adequately covered the issue of whether the prospective jurors would obey the court's instructions regardless of whether they disagreed with them.  None of the prospective jurors had a problem with that rule.  The proposed questions, in contrast, were designed to instruct the jury in a very generalized manner on heat of passion voluntary manslaughter and to ferret out the prospective jurors' amenability to the basis for the defense theory of the case.  Such information might well have been valuable in exercising peremptory challenges, but it was not relevant to a challenge for cause.  We find no abuse of discretion in the court's ruling.

*People v. Tilbury*, 2013 WL 4813164, at *8-11 (footnote omitted).

The United States Supreme Court has held that adequate voir dire is one component of the Sixth Amendment right to an impartial jury.  *Morgan v. Illinois*, 504 U.S. 719, 729-30 (1992); *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion).   However, only two specific inquiries are constitutionally compelled during voir dire: (1) inquiries into a juror's racial prejudice against a defendant charged in a violent crime against a person of a different racial group, *see Mu'Min v. Virginia*, 500 U.S. 415, 425-26 (1991); and, in a capital case, (2) inquiries into a juror's views on capital punishment, *see Morgan*, 504 U.S. at 730.  To sustain a federal constitutional violation, it is not enough that requested voir dire questions might have been helpful; instead, a federal court is limited to determining whether the trial court's failure to ask certain questions on voir dire rendered the trial fundamentally unfair.  *Mu'Min*, 500 U.S. at 425-26 (1991); *see also Harrington*, 562 U.S. at 101 (it is not an unreasonable application of established federal law for a state court to decline to apply a legal rule that has not been squarely established by the Supreme Court).

Applying these legal principles to petitioner's current allegations, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme

United States District Court
Northern District of California

1    Court precedent.

2          Accordingly, petitioner is not entitled to habeas relief on this claim.

3          **8.      Cumulative Error**

4          Petitioner claims he was prejudiced by the cumulative effect of the foregoing asserted

5    errors.  Petition at 28.  In some cases, although no single trial error is sufficiently prejudicial to

6    warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that

7    his conviction must be overturned.  *Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003).  Where

8    there is no single constitutional error existing, nothing can accumulate to the level of a constitutional

9    violation.  *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011); *Mancuso v. Olivarez*, 292 F.3d 939, 957

10   (9th Cir. 2002).  Here, no single constitutional error has been found.

11         Accordingly, petitioner is not entitled to habeas relief on this claim.

12         **9.      Ineffective Assistance of Counsel – Failure to Assert Unconsciousness Defense**

13         Petitioner claims his attorney rendered ineffective assistance by failing to assert an

14   unconsciousness defense.  Petition at 29.  Petitioner presented this claim only on state habeas.  The

15   California Court of Appeal summarily denied the claim.

16         Claims of ineffective assistance of counsel are examined under *Strickland v. Washington*,

17   466 U.S. 668 (1984).  "The benchmark for judging any claim of ineffectiveness must be whether

18   counsel's conduct so undermined the proper functioning of the adversarial process that the trial

19   cannot be relied on as having produced a just result."  *Id*. at 686.  In order to prevail on a claim of

20   ineffectiveness of counsel, a petitioner must establish two factors.  First, he must establish that

21   counsel's performance was deficient, i.e., that it fell below an "objective standard of

22   reasonableness" under prevailing professional norms, *id*. at 687-88, "not whether it deviated from

23   best practices or most common custom," *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing

24   *Strickland*, 466 U.S. at 690).  "A court considering a claim of ineffective assistance must apply a

25   'strong presumption' that counsel's representation was within the 'wide range' of reasonable

26   professional assistance."  *Id.* at 104 (quoting *Strickland*, 466 U.S. at 689).

27         Second, he must establish that he was prejudiced by counsel's deficient performance, i.e.,

28   that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

United States District Court
Northern District of California

31

proceeding would have been different." *Strickland*, 466 U.S. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.*  "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693).  It is unnecessary for a federal court considering an ineffective assistance of counsel claim on habeas review to address the prejudice prong, i.e., the second factor of the *Strickland* test, if the petitioner cannot establish incompetence, as required under the first prong.  *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).

The standards of both 28 U.S.C. § 2254(d) and *Strickland* are "highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation marks omitted).  "[T]he question [under § 2254(d)] is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

The state court could have reasonably concluded that counsel's decision to forgo an unconsciousness defense satisfied professional norms.  Under California law, "[p]ersons who committed the act charged without being conscious thereof" are deemed incapable of committing a crime.  Cal. Penal Code § 26, subd. 4.  Thus, [w]here not self-induced, as by voluntary intoxication . . . , unconsciousness is a complete defense to a charge of criminal homicide." *People v. Newton*, 8 Cal. App. 3d 359, 376 (1970).

Here, the record shows that after a series of four phone calls with Kristine, petitioner drove to her house in the usual time of about 30 minutes.  Ex. 4 at 1023, 1554.  There was no evidence that he had difficulty driving to her house.  Petitioner's phone records indicate that he tried to place a call from his cellphone during the drive at about 8:25 p.m.  Ex. 2 at 64.  Once at Kristine's house, petitioner walked to the door and tried to open it but could not because it was padlocked.  Ex. 4 at 687-88.  When Kristine's brother, Michael, opened the door, petitioner said, "Hi, Mike." Ex. 4 at 688, 699-700.  Michael noticed nothing unusual in petitioner's greeting.  Ex. 4 at 701.  Petitioner walked past Michael and said, "What's up, Kristy?" to Kristine.  Ex. 4 at 701-03.  From beneath his black jacket, petitioner withdrew his handgun, pointed it at Kristine and fired it.  Ex. 4 at 700-06.  He continued firing even after Kristine fell to the floor.  Ex. 4 at 707-09.  There was no

1  evidence that any of his shots missed.  Petitioner then turned, walked out the door, and drove away

2  at a normal speed.  Ex. 4 at 708-09, 712-13.

3     At 8:45 p.m., petitioner called his parents, and his father answered the phone.  The first

4  thing petitioner said was, "She's not going to bother us anymore."  Ex. 4 at 506-07.  Petitioner's

5  voice was high-pitched at the start of the conversation but returned to normal as the conversation

6  continued.  Ex. 4 at 511-12.

7     At approximately 9:10 p.m., a police officer spotted petitioner driving his vehicle.  After

8  following him for about a mile, the officer stopped and arrested petitioner.  Petitioner had no

9  weapons, having evidently thought to dispose of the gun.  Ex. 4 at 654-60.

10    In short, the evidence was inconsistent with unconsciousness.  Petitioner drove for 30

11 minutes to Kristine's house, greeted her brother normally while concealing a large, loaded

12 handgun, used the gun to execute Kristine with several shots at close range, walked out of the

13 house, called his father to report the killing, disposed of the gun, and continued to drive without

14 difficulty until the police stopped him.

15    The defense psychiatrist, Dr. Chamberlain, did not testify that petitioner was unconscious

16 at the time of the shooting, only that petitioner was "acting impulsively," Ex. 4 at 1426, when he

17 shot Kristine after a long period of stress that caused him to "acutely decompensate" in his

18 psychiatric condition.  Ex. 4 at 1433-34, 1436, 1441-42, 1449.  Dr. Chamberlain testified that

19 petitioner exhibited dissociative amnesia when interrogated by the police—during which time

20 petitioner did not recall the shooting—and that the trauma of the killing may have caused the

21 amnesia.  Based on these factors, Dr. Chamberlain opined that the trauma of the killing may have

22 caused petitioner to forget the killing, not that petitioner was unconscious when he did it.  Ex. 4 at

23 1446-48, 1565-66.

24    Defense counsel submitted a declaration in conjunction with petitioner's state habeas

25 proceedings in which she stated:

26    I did not request [an unconsciousness] instruction because I did not believe it was
     applicable or necessary to our defense since we were not arguing that [petitioner] was
27   "legally unconscious" when he shot Kristine.  [Petitioner] testified that he simply had no
     memory of the event due to the traumatic nature of the event.  This was discussed as a
28   "black out" both while [petitioner] testified and through our defense expert.  I also did not

33

stress this point because I did not think it would be a strong or credible argument given the distance that [petitioner] drove from his parents' home to Kristine's home, prior to the homicide.

Ex. 15 at Ex. C, ¶ 4.

Defense counsel's conclusion that an unconsciousness defense would not be strong or believable in light of the evidence was reasonable in light of state law.  *See People v. Halvorsen*, 42 Cal. 4th 379, 418 (2007) ("The complicated and purposive nature of [defendant's] conduct in driving from place to place, aiming at his victims, and shooting them in vital areas of the body suggests [consciousness]"; no error in refusing request for instructions on unconsciousness where defendant "testified in sharp detail regarding the shootings," even though earlier he had told a doctor that he did not remember them); *People v. Rogers*, 39 Cal. 4th 826, 888 (2006) ("Defendant's professed inability to recall the event, without more, was insufficient to warrant an unconsciousness instruction.").

Turning to *Strickland*'s second prong, petitioner cannot show prejudice.  The jury found that petitioner not only intended to kill but acted with premeditation and deliberation.  Thus, the jury necessarily found that petitioner was conscious when he killed Kristine.  Given the jury's finding of premeditation and deliberation, combined with the strong evidence of consciousness, the assertion of an unconsciousness defense would likely not have yielded a more favorable result. *Strickland*, 466 U.S. at 694.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 10.        Ineffective Assistance of Counsel – Failure to Object to Evidence

Petitioner claims his attorney rendered ineffective assistance by failing to object to the introduction of evidence of his combat training certificates and of a knife found in luggage he had brought to his parents' home on his last visit.  Petition at 31.  Petitioner presented this claim only on state habeas.  The California Court of Appeal summarily denied the claim.

"[T]he failure to take a futile action can never be deficient performance."  *Rupe v. Wood*, 93 F.3d 1435, 1445 (9th Cir. 1996).  To succeed on a claim of ineffective assistance from the failure to file a motion, a petitioner must show not only the likelihood of success on the motion, but that the grant of the motion would have affected the outcome.  *Styers v. Schriro*, 547 F.3d

1026, 1030 n.5 (9th Cir. 2008).

The state court did not unreasonably reject this allegation of ineffective assistance. The record shows that defense counsel successfully objected to admission of the knife itself. Ex. 4 at 1644-45. At trial, the prosecutor asked each of petitioner's parents whether they had seen a knife among the personal items in a duffel bag petitioner had brought to their house, and they both testified that they had. Ex. 4 at 416, 517. In addition, Officer Christopher Warren of the San Jose Police Department testified that he seized from petitioner's apartment in Washington a close-quarters combat certificate, an impact weapons certificate, a bladed weapons certificate, and an air taser certificate. Ex. 4 at 481, 565-66, 570. The certificates were entered into evidence. Ex. 4 at 1644-45. The record shows that defense counsel successfully objected to admission of the knife itself but did not object to the parents' testimony regarding the knife or to the admission of the combat certificates. Ex. 4 at 416, 517, 1644-45. Petitioner cannot show that the trial court would have sustained any such objection especially given that the trial court had already denied defense counsel's motion in limine to exclude evidence of petitioner's gun collection. See *People v. Tilbury*, 2013 WL 4813164, at *14-16.

Even assuming that counsel should have objected and that the objection would have been sustained, given all of the other properly admitted evidence of petitioner's guilt, it is not reasonably probable that petitioner would have received a more favorable verdict had counsel succeeded in preventing the jury from learning of the combat training certificates and knife. *Strickland*, 466 U.S. at 692-94. Petitioner concedes that the evidence "proved nothing of consequence." Petition at 32. Indeed, the prosecution only used the evidence to argue one minor point. Specifically, the prosecutor only briefly mentioned the evidence in closing argument, to argue that the evidence of combat training rebutted petitioner's claim that he brought his biggest gun on his drive to California as a result of feeling afraid following his encounter with a stranger at a rest stop. Ex. 4 at 1683-84.

Accordingly, petitioner is not entitled to habeas relief on this claim.

**11.**     **Ineffective Assistance of Counsel – Failure to Object to Closing Argument**

Petitioner claims his attorney rendered ineffective assistance by failing to object on two

occasions during the prosecutor's closing argument.  Petition at 32.  Petitioner presented this claim only on state habeas.  The California Court of Appeal summarily denied the claim.

"From a strategic perspective, [] many trial lawyers refrain from objecting during closing argument to all but the most egregious misstatements by opposing counsel on the theory that the jury may construe their objections to be a sign of desperation or hyper-technicality."  *United States v. Molina*, 934 F.2d 1440, 1448 (9th Cir. 1991); *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993) ("Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct.").

Petitioner first claims defense counsel should have objected to the prosecutor's argument that "no evidence corroborated petitioner's testimony that he was concerned about his children being exposed to drugs while in the victim's custody."  Petition at 32-33 (citing Ex. 4 at 1724-25).  Petitioner claims that the argument was improper because corroborating evidence existed but the defense was prevented from presenting it by the prosecution's successful motion to exclude it.  Petition at 33.

The record shows that, during closing argument, the prosecutor stated that petitioner "indicated to you that he knew for a fact his wife was a drug user and the man she was with was a drug dealer.  Knew that from the day she left him in 2005."  Ex. 4 at 1721.  The prosecutor argued that if petitioner really believed that Kristine was a drug user and that Gonzales was a drug dealer, he would have reported it to the police and to the family court.  Ex. 4 at 1721-24.  The prosecutor pointed out the inconsistency in petitioner's statements to Dr. Chamberlain that Kristine was untruthful and did not admit anything, yet freely admitted to petitioner that she was having an affair with Gonzales, that she was using drugs, and that Gonzales was a drug dealer.  Ex. 4 at 1723.  The prosecutor argued that the only source of evidence that Kristine used drugs was petitioner and that petitioner's statements were inconsistent.  Ex. 4 at 1724-25.  The prosecutor argued that it was hypocritical for petitioner to criticize Kristine's drug use when he said he used methamphetamine with her.  Ex. 4 at 1725; *see* Ex. 4 at 1077, 1251 (petitioner's testimony).  The

United States District Court
Northern District of California

1    prosecutor noted that in one family court document, petitioner asserted that he did not know where

2    the children were and asked that Kristine take a drug test based on his having seen a marijuana

3    pipe at her home.  The prosecutor argued that petitioner later said it was a crack or marijuana pipe,

4    that petitioner eventually admitted that marijuana use did not bother him, and that Kristine's court-

5    ordered drug test was negative.  Ex. 4 at 1725-27; *see* Ex. 4 at 1067-73, 1076-77, 1083-86, 1097-

6    98, 1106-07 (petitioner's testimony).

7           The prosecutor argued that petitioner's statements in family court, Kristine's negative

8    court-ordered drug test, petitioner's own marijuana use, and the lack of drugs in Kristine's body

9    when she was killed, Ex. 4 at 1725-27, all showed that petitioner was not credible in claiming that

10   he was "not just trying to trash her, not trying to dirty her up."  Ex. 4 at 1727-28.

11          In defense counsel's declaration submitted in petitioner's state habeas proceedings, she

12   stated:

13          My interpretation of the prosecutor's argument was that there was no direct evidence to
            support [petitioner's] claims that Kristine used drugs.  As I interpreted it, this was a correct
14          statement because the only direct evidence we had was [petitioner's] testimony that he and
            Kristine did drugs together prior to their separation.  We discussed this issue at length
15          during the prosecutor's motion to exclude evidence of Fabian [Gonzalez]'s drug use as
            irrelevant since Fabian's drug use did not prove or circumstantially show that Kristine was
16          also using drugs despite sharing the same household.  Thus, based on the court's reasoning,
            Fabian's drug used could not help corroborate [petitioner's] testimony.  In addition, I
17          interpreted the prosecutor's argument regarding lack of evidence of Kristine's drug use to
            refer to the negative drug test results Kristine submitted to the family court.  The negative
18          drug test results were discussed in one of the family court transcripts we obtained of the
            family court proceedings.  Based on the information available to me and my interpretation
19          of the evidence, I did not believe counsel's argument was false or misleading to warrant an
            objection for misconduct.
20

21   Ex. 15 at Ex. C, ¶ 7.

22          Because the trial court had previously rejected defense counsel's argument that Gonzales's

23   prior drug convictions showed that Kristine used drugs, defense counsel reasonably concluded that

24   objecting to the prosecutor's argument would be futile.  *See Rupe*, 93 F.3d at 1445 ("[T]he failure

25   to take a futile action can never be deficient performance.").  Further, the evidence showed that

26   Kristine's family-court-ordered drug test was negative.  Ex. 4 at 1097-98.  And a toxicological

27   analysis showed that Kristine had no drugs or alcohol in her blood at the time of her death.  Ex. 4

28

1   at 646-47.  On this record, defense counsel reasonably determined there was no basis for an

2   objection.

3          Petitioner next claims that defense counsel should have objected to the prosecutor's

4   argument that petitioner placed all of the calls between him and Kristine the night of the murder.

5   Petitioner further contends that defense counsel "even gave the appearance of ratifying the

6   prosecution's misstatements by countering that 'the issue is not who called who.'"  Petition at 33.

7          Records of the telephone calls on December 29, 2008 show that of the four calls between

8   Kristine and petitioner, Kristine initiated one at 7:34 p.m., and petitioner initiated three, at 7:34,

9   7:36 and 8:16 p.m.  Ex. 2 at 18, 28, 64.  Petitioner testified at trial that Kristine called him

10  repeatedly, causing him to get angrier and angrier.  Ex. 4 at 1166-67, 1170-71.

11         In closing argument, the prosecutor argued that there was no series of calls with Kristine

12  yelling at petitioner and berating him.  Ex. 4 at 1718.  In defense closing argument, counsel

13  conceded that the evidence showed petitioner was incorrect in testifying that Kristine called him

14  repeatedly.  Ex. 4 at 1787.  Counsel emphasized, however, that "the issue is not who called who"

15  but rather what effect the various calls had on petitioner.  Ex. 4 at 1787-88.  On rebuttal, the

16  prosecutor argued that Kristine did not call petitioner "over and over.  She didn't call him at all."

17  Ex. 4 at 1797.  Later in rebuttal, the prosecutor argued that the phone calls did not constitute

18  provocation because there was "no series of phone calls" and Kristine wasn't calling him but

19  petitioner was calling her.  Ex. 4 at 1810.

20         The prosecutor made one minor misstatement in arguing on rebuttal that Kristine did not

21  call petitioner "at all," when the evidence showed that she actually initiated one of the four phone

22  calls.  Ex. 4 at 1797.  Defense counsel reasonably did not object to that misstatement.  She

23  recognized that the prosecutor's "main point was that there was no evidence of Kristine's repeated

24  calls [to petitioner] that night, which was an accurate statement based on the phone records."  Ex.

25  15 at Ex. C, ¶ 5.  Because the prosecutor did not make an egregious misstatement and the

26  prosecutor's main point, that Kristine was not repeatedly calling petitioner, was a correct summary

27  of the evidence, defense counsel's failure to object did not constitute ineffective assistance.

28  *Garcia v. Bunnell*, 33 F.3d at 1199; *United States v. Necoechea*, 986 F.2d at 1281; *United States v.*

United States District Court
Northern District of California

*Molina*, 934 F.2d at 1448.

The record also shows that defense counsel's argument that who initiated the calls was unimportant did not "ratify" the prosecutor's misstatement because the misstatement occurred during rebuttal, i.e., after defense counsel's argument.  Defense counsel reasonably urged the jury to focus on the content of the phone calls rather than on who called whom, given that the evidence established that petitioner initiated the majority of the calls.

Finally, petitioner fails to show prejudice.  Any objection regarding the lack of evidence of Kristine's drug use likely would have been overruled as meritless given the thin evidence on this point at trial.  And the jury likely would have deemed petty an objection pointing out that Kristine initiated one of the four phone calls before her death.  Finally, objecting to the prosecutor's closing argument would not have affected the result of petitioner's trial in light of the strong evidence of his guilt.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 12.      Cumulative Error Arising from Trial Counsel's Errors

Petitioner claims he was prejudiced by the cumulative effect of his trial counsel's allegedly ineffective performance.  The Court has found that counsel's performance did not fall below an objective standard of reasonableness.

Accordingly, petitioner is not entitled to habeas relief on this claim.

## C.      Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  *Id.* § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district

court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## IV.  CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

Additionally, the Clerk is directed to substitute Robert W. Fox on the docket as the respondent in this action.

**IT IS SO ORDERED.**

Dated: 8/1/2016

HAYWOOD S. GILLIAM, JR.
United States District Judge